ENRIQUE CALDERÓN LASSÉN, ANTONIO ACEVEDO TORRES, ALEJANDRO C. ANTONGIORGI VEGA, ELPIDIO ARCAYA PEÑA, FLOR DE MARÍA CASTELLANOS, PEDRO A. CLAVEROL RIVERA, HÉCTOR ANÍBAL COLÓN CRUZ, ANGEL ALFONSO COLÓN, DAVID CORREA HERNÁNDEZ, FÉLIX R. DEL CASTILLO HERNÁNDEZ, ORLANDO A. DISDIER DÍAZ, JULIO C. GONZÁLEZ ROMÁN, OLAGUIBEET A. LÓPEZ PACHECO, MARCOS R. MALDONADO PABÓN, GUILLERMO MÉNDEZ MUÑOZ, GIL ALFONSO MORALES RIVERA, HERBER MUSSENDEN ROTGER, PEDRO N. ORTIZ TORREFORTE, RAFAEL PACHECO RIVERA, ALICIA PLATET CANALES, MIGUEL ANGEL SALICRUP CABELLO, VICENTE SANTIAGO REYES, MIGUEL TORRES LAFUENTE, LUIS TOTTI, JUAN JOSÉ TURULL LAFFIGNE, peticionarios.

## SOLICITUDES DE ADMISION A EXAMEN DE REVALIDA

### RESOLUCION

San Juan, Puerto Rico, a 17 de junio de 1963

Se aprueban las anteriores solicitudes de admisión a examen de reválida. Dése cuenta con ellas a la Junta Examinadora para el correspondiente trámite ulterior.

Lo acordó el Tribunal y firma el Señor Juez Presidente, quien, al igual que los Jueces Asociados Señores Blanco Lugo, Dávila y Ramírez Bages, no está conforme con la admisión a examen de los peticionarios. El Juez Presidente y el Juez Asociado Señor Blanco Lugo fundamentarán sus votos por separado.

(Fdo.)   Luis Negrón Fernández

*Juez Presidente*

Certifico:

(Fdo.)   Joaquín Berríos

*Secretario Interino*

931

—O—

Voto explicativo del ·Juez Asociado Señor Santana Becerra
San Juan, Puerto Rico, a 9 de agosto de 1963

Los peticionarios obtuvieron sus títulos de abogados de la
Escuela de Derecho de la Universidad Interamericana. Radi-
caron sus solicitudes para admisión a examen de reválida
estando en vigor un Reglamento de este Tribunal que en lo
pertinente dispone:

"El ejercicio, por el Consejo Superior de Enseñanza, de la
función de acreditación de escuelas de Derecho establecidas en
Puerto Rico, a los fines de esta Regla, será sin perjuicio de la
facultad inherente de este Tribunal para hacer su propia deter-
minación sobre la admisión de los graduados de dichas escuelas a
examen de reválida, bajo circunstancias que lo justifiquen."

Para mí es claro que cualquiera que sea o haya sido la
interpretación—en otros sectores—de la Ley Núm. 88 de 25
de abril de 1949, la determinación de quién ha de ser admitido
a examen de reválida para ejercer la abogacía en Puerto
Rico en lo que a cualidad profesional concierne, es función
exclusiva del Tribunal Supremo, y en lo que a ello respecta,
cualquier delegación absoluta, directa o indirectamente, de
esa función judicial, y cualquier limitación de la misma, es
improcedente.

Asumiendo, no obstante, que se requiriera la presencia de
"circunstancias que lo justifiquen" para que el Tribunal Su-
premo ejerza a plenitud esa función intransmisible, voté por
la admisión a examen de estos aspirantes:

Porque ellos obtuvieron sus títulos de abogados en una
escuela de Derecho que pertenece a una institución de En-
señanza Superior como lo es la Universidad Interamericana,
Institución Superior de Enseñanza que goza de méritos que
sólo un ánimo prevenido o prejuiciado se permitiría cues-
tionar;

porque ya que se ha traído a las constancias de este asunto
el "Informe Relativo a la Acreditación de la Escuela de De-

recho de la Universidad Interamericana" estimo—sin querer evaluar ahora el aspecto equitativo de dicho Informe—que la manera en que se constituyó el Comité de Acreditación que rindió el mismo no responde al mejor sentido de la creación de un cuerpo juzgador totalmente desinteresado e imparcial;

porque la Facultad de la Escuela que concedió títulos a los aspirantes está integrada por profesores de amplios conocimientos y vasta experiencia en las disciplinas del Derecho, personalidades distinguidas de la profesión, de la cátedra, de la judicatura, en la vida y en el servicio públicos, que hacen honor, y dan prestigio, a cualquier escuela de Derecho;

porque los aspirantes son personas que con loable sentido de devoción y de dedicación al estudio han querido mejorarse en sus capacidades y potencialidades;

porque sería injusto, en respuesta a ese deseo de perfeccionarse intelectualmente y de convertirse en ciudadanos más útiles, el que se les cierren las puertas y se les tronchen sus aspiraciones logrados ya sus títulos, al negárseles la oportunidad, por razones para mí insustanciales, de demostrar mediante un examen si están o no cualificados profesionalmente para ejercer la profesión de abogado;

porque si bien deben existir buenas normas en la preparación de abogados, no creo que el ejercicio de la profesión legal deba quedar al alcance de sólo aquellos escogidos en condiciones idealizadas, más favorecidos por la suerte o por las oportunidades;

porque en mi concepto, la profesión de abogado debe ser una eminentemente de utilidad social para beneficio de todos los sectores de la comunidad;

por lo anteriormente expuesto, y porque no creo en la destrucción de los valores del espíritu, voté por la admisión a examen de estos aspirantes. Se une a las constancias de este asunto, como parte de este escrito, el documento suscrito por el Dr. Ronald C. Bauer, Presidente de la Universidad Interamericana, "en relación con el proceso de acreditación de la

Facultad de Derecho de dicha Institución educativa," publicado en la edición del día 17 de abril de 1963 en el periódico "El Mundo."*

Radíquese esta expresión de mi voto en el expediente.

—O—

## Voto disidente del Juez Presidente Señor Negrón Fernández
### San Juan, Puerto Rico, a 5 de agosto de 1963

Este Tribunal no puede ser imagen de unos valores en crisis. La determinación de admitir a examen de reválida a los aquí peticionarios constituye una regresión en el concepto de la educación legal en Puerto Rico que no hemos debido auspiciar. En efecto anula—mediante un inmoderado ejercicio de poder—la política pública declarada por la Asamblea Legislativa a través de la Ley Núm. 88 de 25 de abril de 1949, que establece un sistema de acreditación de instituciones docentes de carácter privado para que éstas queden investidas *de autoridad pública* para ejercer sus funciones docentes, otorgar créditos y conferir grados académicos. De hecho, prejuzga toda otra petición de admisión a examen que en el futuro otros aspirantes de igual procedencia académica hayan de hacer a este Tribunal, porque es dudoso que en cuanto a sus estudios legales puedan producirse circunstancias menos favorables a su admisión que las que aquí concurren.

Hemos comprometido peligrosamente el sentido de nuestra responsabilidad institucional al prescindir—sin medios ni instrumentos para determinarlas por nosotros mismos—de las normas promulgadas bajo autoridad de ley por el organismo facultado para medir los valores de capacidad y eficiencia de las escuelas de Derecho en Puerto Rico.

Hemos ignorado aun las normas básicas de admisión contenidas en nuestras propias Reglas—adoptadas con vista de las recomendaciones del Comité de Educación Legal y Admi-

---

*Nota del Compilador:* Este documento aparece en la página 967 de este tomo.

sión al Ejercicio de la Abogacía de la Conferencia Judicial de Puerto Rico—al hacer uso de la facultad inherente que nos reservamos recientemente para ejercer tan sólo "bajo circunstancias que lo justifiquen."

Hemos admitido a examen a los aquí peticionarios en evidente confusión de los valores envueltos. En marcha de retroceso en el ámbito de la educación legal no se avanza hacia la superación que aspiramos en la profesión de la democracia, que es la abogacía.

—O—

Voto separado del Juez Asociado Señor Blanco Lugo
San Juan, Puerto Rico, a 28 de junio de 1963

El resultado de la votación en relación con la aprobación de las solicitudes de admisión de varios diplomados de la Universidad Interamericana me obliga a exponer las razones que he tenido para no concurrir con el juicio mayoritario. Nada más apropiado que comenzar con un recuento en orden cronológico de ciertos hechos básicos a los cuales aparentemente se ha hecho caso omiso o que han sido deliberadamente ignorados.

Por resolución de 3 de noviembre de 1959 este Tribunal enmendó la Regla 8(A)(1)(a) de su Reglamento, referente a la admisión al ejercicio de la abogacía, para requerir en la parte pertinente, que todo aspirante "radicará . . . una solicitud escrita haciendo constar bajo juramento: . . . [que] *ha cursado todos sus estudios de derecho y ha obtenido el grado correspondiente en colegios de derecho acreditados por la American Bar Association o por el Tribunal Supremo de Puerto Rico.*" (Bastardillas nuestras.) Desde el 18 de enero de 1950 solamente habíamos exigido que el solicitante se hubiese titulado de un colegio de derecho acreditado por la American Bar Association o por el Tribunal Supremo de Puerto Rico, sin referencia alguna a la institución en que

hubiese cursado sus estudios. (¹) Esto explica por qué se admitieron a examen personas que cursaron estudios antes de 1959 en la San Juan School of Law pero que presentaron títulos expedidos por las universidades de Puerto Rico y Kansas City. (²)

En 12 de diciembre de 1960 se enmendó nuevamente, *con la concurrencia de todos los jueces que entonces integraban este Tribunal,* la Regla 8(A)(1)(a) para requerir que el aspirante hiciera constar que "ha cursado todos sus estudios de derecho y ha obtenido el grado correspondiente en colegios de derecho acreditados por el Consejo Superior de Enseñanza, si el aspirante hubiere cursado sus estudios de derecho en Puerto Rico, o por la American Bar Association o por el Tribunal Supremo de Puerto Rico si el aspirante hubiese cursado sus estudios de derecho fuera de Puerto Rico."

Durante el mes de febrero de 1961 el Rector de la Universidad de Puerto Rico anunció las reglas propuestas para regir el reconocimiento de escuelas de Derecho, con arreglo a las disposiciones de la Ley Núm. 88 de 25 de abril de 1949. (³)

En 29 de junio de 1961 este Tribunal adoptó unánimemente un nuevo Reglamento que conservó la Regla 8(A)(1)(a) según había sido redactada en 12 de diciembre de 1960.

El día 22 de julio de 1961 el Consejo Superior de Enseñanza, a propuesta del Rector de la Universidad de Puerto Rico, adoptó las reglas para la acreditación de escuelas de

---

(¹) Esta redacción se conservó a través de las revisiones de la Regla 8 en 21 de diciembre de 1953 y 29 de marzo de 1954.

La Regla 8(1) del Reglamento aprobado en 15 de marzo de 1946 disponía que sólo serían admitidos a examen los graduados de la Universidad de Puerto Rico y de universidades clasificadas en Clase "A" por la American Bar Association.

(²) Según surge de los expedientes, estas universidades le dieron crédito por los estudios cursados en la San Juan School of Law. Para esa fecha no se habían adoptado por el Consejo Superior de Enseñanza las normas de acreditación a que nos referiremos posteriormente.

(³) 18 L.P.R.A. secs. 801 y ss.

Derecho, (⁴) a que se refieren los informes que se unen a este voto.

La Escuela de Derecho de la Universidad Interamericana comenzó a funcionar en el mes de agosto de 1961, brindando un curso nocturno. Veinte meses después—en abril de 1963—se diploma con la licenciatura en derecho a los peticionarios, después de haber cursado cuatro trimestres de estudios.

En 30 de noviembre de 1962 enmendamos la Regla 8(1) para adicionarle el siguiente párrafo:

"El ejercicio, por el Consejo Superior de Enseñanza, de la función de acreditación de escuelas de Derecho establecidas en Puerto Rico, a los fines de esta Regla, será sin perjuicio de la facultad inherente de este Tribunal para hacer su propia determinación sobre la admisión de los graduados de dichas escuelas a examen de reválida, *bajo circunstancias que lo justifiquen.*" (Bastardillas nuestras.)

Una solicitud típica de las que consideramos acompaña una certificación expedida por la Registradora de la Universidad Interamericana, de la cual surge que su Escuela de Derecho le dio crédito al aspirante por materias cursadas después de noviembre de 1959 y antes de junio de 1961 en la San Juan School of Law, *institución que no había sido acreditada ni por el Consejo Superior de Enseñanza ni por este Tribunal.* (⁵)

---

(⁴) Es preciso advertir que la Asamblea Legislativa indicó que las normas "[d]eberán ajustarse a los principios y métodos puestos en práctica por conocidos sistemas acreditativos similares a éste, abarcando todos los aspectos orgánicos y funcionales de las instituciones a las cuales habrán de aplicarse, tales como la idoneidad y composición de la facultad, el programa de estudios, su contenido, distribución y evaluación académicos, el producto cultural, la administración e inspección, la planta física, el equipo, y cualesquiera otros aspectos relativos a su organización y funcionamiento." Sec. 2 de la Ley Núm. 88 de 25 de abril de 1949, 18 L.P.R.A. sec. 802.

(⁵) Los 26 créditos que les fueron acreditados con un simple curso de repaso fueron los siguientes: Introducción al Derecho, *Derecho Penal I,* *Procedimiento Criminal, Derecho de Familia, Derecho de Propiedad,* Legislación, *Procedimiento Civil, Derecho Constitucional* y *Sucesiones.*

No creo que pueda escaparse, ni aun al más ingenuo, que los cursos

De todo lo expuesto se deduce claramente que, aun sin pasar específicamente sobre el asunto de la acreditación de la Universidad Interamericana, los peticionarios no cumplen con nuestra disposición reglamentaria al efecto de que *todos los estudios* se hayan cursado en un centro de enseñanza acreditado. A este respecto es bueno subrayar que cuando la Escuela de Derecho de esta universidad acreditó en el verano de 1961 los estudios hechos por los candidatos en la San Juan School of Law era de conocimiento general que desde noviembre de 1959 nuestro Reglamento contenía el requisito indicado. Igual conocimiento es atribuible a los aspirantes.

Para soslayar la letra clara de nuestro Reglamento que contiene el requisito de que *todos* los estudios se hayan cursado en un centro de enseñanza acreditado, se invoca la exclusividad de nuestra función para admitir aspirantes a examen. Admito que tenemos esa función, pero en su ejercicio estamos obligados por las normas que nosotros mismos nos impusimos en nuestro Reglamento. Para mí es claro que si el incontenible y palmario deseo era el de admitir a los peticionarios el único camino viable era el de enmendar la Regla 8(A)(1)(a) y eliminar el requisito tantas veces mencionado. Resulta pues un lamentable contrasentido que se atribuya a otros "un ánimo prevenido y prejuiciado" en relación con este asunto. A menos que se trate de un proceso subconsciente de auto-caracterización.

Pero hay más. Aun cuando pudiera afirmarse que este requisito puede pasarse por alto en el ejercicio de la "facultad inherente" para hacer nuestra propia determinación sobre la admisión de graduados de escuelas de Derecho de Puerto Rico, según reza actualmente la Regla 8(A)(1)(a), este ejercicio está expresamente condicionado a que sea "bajo circunstan-

---

acreditados comprenden las materias básicas de la educación legal.

Vale la pena aclarar que la Escuela de Derecho de la Universidad Católica de Puerto Rico admitió trece estudiantes que habían asistido a cursos de la San Juan School of Law, pero la admisión se hizo sin tener en cuenta tales estudios.

cias que lo justifiquen." *Ni en las peticiones presentadas ni en el curso de la consideración de este asunto se ha expuesto hecho alguno que demuestre que las circunstancias justifican la admisión de los peticionarios.* Se han adelantado unos fundamentos para justificar la actuación de la mayoría, pero a poco que se examinen se observará que no tienen relación alguna con el asunto planteado o aceptan como ciertos hechos que el más ingenuo rechazaría. Ni aun con el más refinado ejercicio de sugestión puede ocultarse que el único criterio que ha informado la determinación aludida es el de una pretendida conmiseración, que no es de lugar, pues los hechos según relatados precedentemente revelan que los peticionarios tenían conocimiento cuando comenzaron sus "estudios" de los requisitos que se exigían por nuestro Reglamento. Tanto ellos, como la institución que los diplomó, incurrieron en una abierta y calculada transgresión de los mismos.

Limitaciones de tiempo me impiden discutir ampliamente sobre la calidad de la enseñanza del Derecho en la Universidad Interamericana. Para subsanarlo en parte, uno a este voto el informe del comité de acreditación designado por el Rector de la Universidad de Puerto Rico(6) y la réplica al mismo suscrita por el Decano de la Facultad de Derecho de la Universidad Interamericana. Una simple lectura de ambos documentos demuestra que hay hechos incontrovertidos que militan en contra de la acreditación *en estos momentos.* Pretender

---

(6) La Sec. 3 de la Ley de Acreditación, 18 L.P.R.A. sec. 803, dispone que una vez presentada una solicitud de acreditación, el Consejo Superior de Enseñanza trasladará la misma al Rector de la Universidad "quien designará tres o más miembros del claustro y la administración universitaria o de otros centros o agencias educativas para su estudio . . ." Resulta pues claro que en la estructuración del comité de acreditación el Rector se atuvo estrictamente a la letra de la ley. Sin embargo, se indica que el mismo "no responde al mejor sentido de la creación de un cuerpo juzgador totalmente desinteresado e imparcial." La mejor contestación a esta manifestación sin fundamentos es indicar que del mismo formaban parte los licenciados Abrahán Díaz González y Manuel Abréu Castillo, y los miembros del claustro universitario—tal cual lo exige la ley, repetimos— licenciados Lino J. Saldaña, José M. Canals y Margaret Hall.

sostener lo contrario es elevar la condescendencia a la categoría de dogma.

Es por eso que, utilizando el criterio de valores que inalterablemente he aplicado en mis actuaciones judiciales, independientemente de la identidad de las personas interesadas o las entidades afectadas, no puedo concurrir con el precedente sentado por los cinco compañeros de la mayoría, que presagia un deterioro en la calidad de la educación legal en Puerto Rico.

Estoy autorizado para indicar que el Juez Asociado señor Ramírez Bages concurre con lo aquí expuesto.

# INFORME RELATIVO A LA ACREDITACION DE LA ESCUELA DE DERECHO DE LA UNIVERSIDAD INTERAMERICANA

*I. Nombramiento y Deberes del Comité de Acreditación*

En virtud de lo dispuesto por la Ley Núm. 88 del 25 de abril de 1949, [1] por las Reglas del Tribunal Supremo de Puerto Rico, [2] y por las reglas que aprobó el Consejo Superior de Enseñanza el 22 de julio de 1961, [3] relativas al reconocimiento de las escuelas de derecho en Puerto Rico, el Rector de la Universidad procedió a nombrar el 6 de octubre de 1961, un comité de acreditación compuesto por las siguientes personas:

Lic. Abrahán Díaz González, Presidente

---

[1] El preámbulo de la Ley Núm. 88 lee así: Para establecer un sistema acreditativo de colegios y otras instituciones de estudios superiores de carácter privado; para constituir a la Universidad de Puerto Rico en Agencia Oficial a cargo de fijar las normas y los requisitos inherentes a tal sistema, y de investigar y dictaminar en relación con su reconocimiento, para conferir a la misma Universidad de Puerto Rico el poder de inspeccionar y clasificar los centros de enseñanza citados, con miras a la elevación de sus índices de eficiencia; para determinar las condiciones bajo las cuales dichos colegios y otras instituciones de estudios superiores podrán obtener del Estado el certificado de Reconocimiento y para otros fines.

[2] La Regla 8 provee que todo candidato a ser admitido al ejercicio de la abogacía que haya cursado estudios en Puerto Rico deberá hacer constar "que ha obtenido el grado correspondiente en colegios de derecho acreditados por el Consejo Superior de Enseñanza . . ." El 30 de noviembre de 1962 el Tribunal añadió a esta regla el siguiente párrafo: "El ejercicio, por el Consejo Superior de Enseñanza, de la función de acreditación de escuelas de Derecho establecidas en Puerto Rico, a los fines de esta Regla, será sin perjuicio de la facultad inherente de este Tribunal para hacer su propia determinación sobre la admisión de los graduados de dichas escuelas a examen de reválida, bajo circunstancias que lo justifiquen."

[3] Las Reglas disponen que, tan pronto una institución notifique al Rector de la Universidad de Puerto Rico su propósito de organizar una escuela de derecho que aspire a recibir acreditación del Consejo Superior de Enseñanza, y envíe un informe inicial ". . . El Rector nombrará un Comité experto en educación legal . . . que . . . informará al Rector, por lo menos una vez al año, sobre el progreso de la Escuela hacia el propósito de alcanzar las normas que se exigen para acreditarla."

Lic. Manuel Abréu Castillo ([4])

Lic. Lino J. Saldaña

Prof. Margaret Hall

Prof. José M. Canals, Secretario.

El señor Rector designó asesor del Comité al Dr. David M. Helfeld, Decano de la Facultad de Derecho de la Universidad de Puerto Rico.

Al Comité se le encomendó reunirse regularmente con las autoridades de la nueva escuela, emprender aquellos procedimientos de evaluación que considerara pertinentes, e informar al Rector por lo menos una vez al año sobre el progreso de la Institución respecto al cumplimiento de las normas exigidas para la acreditación. El Comité celebró su primera reunión el día 7 de octubre de 1961.

## II. Procedimientos de Evaluación Seguidos por el Comité

Para desempeñar su cometido, el Comité estimó necesario:

1. Establecer un programa de visitas a la escuela; ([5])

2. Aquilatar los criterios utilizados para seleccionar al estudiantado;

3. Comparar los criterios de convalidación de cursos con los exigidos por otras organizaciones interesadas en la acreditación y buena marcha de las escuelas de derecho; ([6])

4. Obtener y analizar muestras representativas de los exámenes ofrecidos;

5. Examinar un número representativo de las contestaciones a dichos exámenes; ([7])

---

([4]) El Lic. Abréu Castillo renunció su cargo como miembro del Comité el 17 de septiembre de 1962, al ser electo Presidente del Colegio de Abogados, por entender que ambas funciones eran incompatibles.

([5]) Las visitas a clase tuvieron lugar especialmente durante las semanas que comenzaron el 3 de abril, el 2 de julio y el 9 de julio de 1962. Algunos miembros del Comité han realizado visitas esporádicas adicionales.

([6]) Se han considerado las normas para convalidación de cursos aprobados en otras escuelas, establecidas por la Association of American Law Schools. (Ver página 15, infra.)

([7]) De los exámenes ofrecidos en abril 1962, se examinaron Derecho Constitucional, Derecho Laboral II, Procedimiento Civil y Contribuciones; de los ofrecidos en agosto de 1962 Derecho Penal II, Procedimiento Criminal, Torts II y Evidencia.

6. Examinar las calificaciones conferidas al estudiantado;

7. Evaluar las normas para la selección de la Facultad, así como los métodos para dotar de continuidad a la misma;

8. Obtener información sobre el número y selección de libros y sobre el funcionamiento y crecimiento de la biblioteca;

9. Apreciar otros factores ancilares tales como actividades extracurriculares, facilidades físicas, adecuación de las aulas, etc.

Aunque el Comité estuvo listo para emprender el proceso de evaluación desde octubre de 1961, no fue hasta el 20 de marzo de 1962 que se obtuvo el visto bueno de las autoridades de la Escuela de Derecho de la Universidad Interamericana para que comenzara el mismo.[8] El 3 de abril de 1962, se celebró la primera visita a las aulas y la primera reunión con el Decano, Lic. Hipólito Marcano.

## III. Breve Historial de la Escuela de Derecho de la Universidad Interamericana

La Escuela de Derecho de la Universidad Interamericana inició sus cursos regulares, con carácter de escuela exclusivamente nocturna, en agosto de 1961. La clase de primer año constaba de 112 estudiantes. Además, se admitieron con categoría de estudiantes avanzados 100 candidatos procedentes de escuelas de derecho no acreditadas, después de haberlos sometido, según información suministrada por la Escuela, a un proceso de convalidación de cursos durante el verano de 1961.

En enero de 1962, se constituyó una segunda clase de principiantes integrada por 52 estudiantes; y en agosto de 1962, una tercera compuesta de 71 estudiantes.

---

[8] El Presidente del Comité intervino directamente con el Decano Marcano por teléfono y por carta el 15 de febrero de 1962, para que se lograra un pronto acuerdo con respecto al comienzo de los procedimientos de evaluación. Por carta del 20 de marzo de 1962 el Decano Marcano le expresó al Rector de la Universidad de Puerto Rico su conformidad para que se implementara el programa de evaluación.

La Escuela de Derecho funciona sin períodos de vacaciones, a base de trimestres en lugar de semestres, por lo que el tradicional programa de estudios se cubre por completo en tres años. La Escuela se propone conferir los primeros grados de Bachiller en Derecho en abril de 1963 a un grupo de 34 alumnos que comenzaron sus estudios con carácter de estudiantes avanzados en agosto de 1961.

Las clases se ofrecen de seis y media a diez y media de la noche de lunes a viernes en el Edificio Bernardini, Avenida Eleanor Roosevelt, Hato Rey.

El costo de la matrícula en la Escuela asciende a $250 por trimestre si se toman 9 créditos o más. De lo contrario, el costo por crédito académico es de $25.00. Esto incluye asistencia médica, uso de la biblioteca, etc.

*IV. Determinaciones del Comité respecto al Cumplimiento por la Escuela de Derecho de la Universidad Interamericana de las Normas Establecidas por el Consejo Superior de Enseñanza*

En el proceso de evaluación el Comité ha seguido las normas establecidas por el consejo. Las siguientes conclusiones se basan en las observaciones realizadas por los miembros del Comité y en el análisis de la documentación solicitada y obtenida de las autoridades de la Escuela.

*Norma A*

EL CURRICULO DE UNA ESCUELA GRADUADA ACREDITADA PARA LA ENSEÑANZA DEL DERECHO PROVEERA SUFICIENTE TIEMPO PARA EL ESTUDIO Y EL DESARROLLO, EN UN AMBIENTE DE DEDICACION Y DISCIPLINA INTELECTUAL, DE AQUELLAS MATERIAS Y ACTIVIDADES NECESARIAS PARA PREPARAR ADECUADAMENTE AL ESTUDIANTE PARA PRACTICAR LA PROFESION DE ABOGADO.

Esta norma alude primeramente al tiempo indispensable para que se pueda desarrollar un proceso satisfactorio de formación profesional. Se reconoce también la necesidad de un ambiente formativo idóneo en adición a un programa de estudios adecuado.

El programa de cursos ofrecido en la Escuela de Derecho de la Universidad Interamericana adolece de dos fallas importantes respecto al factor temporal. Los cursos se ofrecen generalmente durante dos períodos de dos horas cada uno por noche. Esta alta concentración por materia[9] resulta opresiva para estudiantes muchos de los cuales ya han trabajado una jornada completa, y en consecuencia limita considerablemente el beneficio que pueden derivar de la asistencia a clases. Igual concentración existe en la tarea docente de muchos profesores. Por ejemplo, durante el trimestre en curso (agosto–diciembre 1962) hay un profesor que enseña semanalmente cinco cursos durante catorce horas en cuatro noches, otro enseña diez horas en cuatro noches y otro diez horas en tres noches. [10]

En adición a esta concentración diaria existe otra en términos del programa anual. Los trimestres se suceden sin interrupción, sin períodos adecuados de vacaciones ni consideración a la necesidad fisiológica de descansar. La psicología del aprendizaje postula la necesidad de un alto en el camino de vez en cuando para meditar, analizar, categorizar y ordenar los conocimientos adquiridos.

La norma menciona además "un ambiente de dedicación y disciplina intelectual". La evaluación realizada por el Comité comprueba que la escuela no cumple con dicho requisito. Hay muy poca oportunidad para establecer coloquio personal entre profesores y alumnos. No hay tiempo para estimular actividades necesarias a la adecuada preparación del estudiante para practicar la profesión de abogado. Por ejemplo, hasta el presente ni la facultad ni los estudiantes publican una revista jurídica. Se nota la ausencia de ese "ambiente de dedicación

---

[9] De los 46 períodos de clase que se ofrecen durante el trimestre en curso (agosto–diciembre 1962), 32 son de dos horas sobre la misma materia.

[10] Es interesante notar que la norma de la Association of American Law Schools con relación a los profesores de tarea completa lee así: II-4. Maximum Teaching Loads. "A faculty member should not teach more than an average of eight hours per week".

y disciplina intelectual" en clases donde la falta de discusión y esfuerzo analítico acusan un clima de cansancio intelectual y de superficialidad en la labor docente. La mayoría de los profesores hace muy pocas preguntas a los estudiantes. Las preguntas que, a su vez, formulan los estudiantes revelan insuficiencia de estudio previo de la materia envuelta.

La observación personal de las clases por parte de los miembros del Comité demuestra serias deficiencias en la metodología docente. Por regla general no se exige preparación previa adecuada a los estudiantes y por lo tanto la poca participación de éstos en clase se efectúa sobre una base de improvisación. En algunas clases ocasionalmente se requieren trabajos por escrito o la lectura de determinados artículos. A veces se asignan casos individuales a cada estudiante. En otras clases los profesores se limitan a dictar las reglas legislativas o jurisprudenciales sin análisis crítico y sin organización adecuada. El análisis de un número representativo de las contestaciones a los exámenes ofrecidos al finalizar el primer y el segundo trimestre del año en curso demuestra que el esfuerzo principal de los estudiantes consiste en aprender principios jurídicos de memoria para vertirlos luego en el cuaderno de exámenes. Este método tiene la aprobación de los profesores a juzgar por el desglose de las calificaciones otorgadas.

La distribución de notas para el trimestre de agosto–diciembre 1961, fué la siguiente: A-114, B-298, C-248, D-49 y F-34 y para el de enero–abril 1962: A-129 B-338, C-220, D-29 y F-30. (11) Estas calificaciones demuestran una marcada falta de exigencia, especialmente si consideramos que de los candidatos admitidos durante los últimos tres trimestres el 62%, el 58% y el 63% habían obtenido menos de 2.5 de promedio en el bachillerato.

---

(11) El Comité obtuvo las calificaciones otorgadas en 6 de los cursos ofrecidos durante el trimestre abril–agosto 1962. Un poco más de la mitad de las mismas son A y B.

La ubicación de las aulas es inadecuada. El calor en los salones de clase durante el verano es agobiante. Los ruidos trascienden de un salón a otro. La facultad no dispone de oficinas en la escuela, de modo que aunque hubiera tiempo para ello no hay sitio donde el maestro pueda recibir a los estudiantes en consulta. En resumen, la escuela de Derecho de la Universidad Interamericana utiliza un método de enseñanza superficial que no conduce a forjar el tipo de mentalidad jurídica que es atributo esencial del abogado. El Comité estima que la escuela no cumple con la Norma A.

*Norma B*

EL CURRICULO DE UNA ESCUELA GRADUADA ACREDITADA PARA LA ENSEÑANZA DEL DERECHO SE OFRECERA EN UN PROGRAMA REGULAR DE ESTUDIOS QUE REQUIERA LA DEDICACION DEL ESTUDIANTE POR UN TIEMPO NO MENOR DE TRES AÑOS EN LA SECCION DIURNA. ADEMAS DEL PROGRAMA REGULAR DE ESTUDIOS EN LA SECCION DIURNA, PODRA OFRECER UN PROGRAMA PARCIAL O IRREGULAR DE ESTUDIOS, DE IGUAL CONTENIDO Y CALIDAD QUE EL PROGRAMA REGULAR, QUE REQUIERA LA DEDICACION DEL ESTUDIANTE DURANTE UN PERIODO DE TIEMPO NO MENOR DE CUATRO AÑOS.

De ser aplicada esta norma en su totalidad, la escuela no podría recibir acreditación, por dos razones. Primero, porque no se ha provisto la creación de un programa diurno, y segundo, porque el programa nocturno se ofrece en tres años en lugar de cuatro.

En una carta fechada 19 de octubre de 1961, el Decano Marcano expresó lo siguiente al Honorable Cándido Oliveras, Presidente del Consejo Superior de Enseñanza:

"La sección *b* dispone que el programa regular de estudios será de no menos de tres años en la sección diurna. Luego añade que *además* del programa regular de estudios en la sección diurna, la escuela podrá ofrecer un programa *parcial* o *irregular* de estudios durante un período de tiempo no menor de cuatro años. Precisa que usted interprete si esa disposición quiere decir que una Escuela de Derecho acreditada tiene que ofrecer principalmente un programa *diurno* y *además* puede ofrecer un programa nocturno. Nuestra Facultad tiene un programa regular nocturno

exclusivamente, ya que hay una extraordinaria demanda de este tipo de educación profesional, pero estamos en la mejor disposición de servir a los intereses del pueblo de acuerdo con sus necesidades.

Se establece también en dicha sección, que ese 'programa parcial o irregular' debe requerir la dedicación del estudiante 'durante un período de tiempo no menor de cuatro años'. Asumimos *arguendo* que tal disposición se refiere al programa nocturno, en cuyo caso el mismo sería por no menos de cuatro años. Como es de su conocimiento, un programa nocturno de cuatro años tendría que ser necesariamente a base de dos semestres por año. Nuestra Universidad ha implantado con éxito el sistema de tres trimestres por año, el cual permite a un estudiante de derecho terminar su carrera en la sesión nocturna en tres años. Nuestros trimestres son exactamente iguales en tiempo a los semestres regulares universitarios y la calidad y contenido de nuestro programa de estudios es igual a los programas regulares diurnos de cualquier Escuela de Derecho reconocida, tomando en consideración las peculiaridades de nuestra vida jurídica. Solicitamos respetuosamente su interpretación al efecto de que una Escuela de Derecho pueda funcionar exclusivamente en sesiones nocturnas con un programa regular de tres años, si opera mediante el sistema de trimestres académicos."

En torno al mismo problema el Rector de la Universidad de Puerto Rico le expresó lo siguiente al Lic. Marcano, en una carta fechada el 28 de diciembre de 1961:

"El apartado *b* de las normas indica, como usted señala, que los programas nocturnos serán subsidiarios de un programa diurno. La razón de ser de esa disposición está indicada en mis clarificaciones iniciales. Se considera indispensable la existencia de una organización estable, un núcleo básico de funcionarios y profesores, plenamente dedicados a atender las responsabilidades de la docencia y de la administración y se supone que un grupo así constituído trabajará normalmente con estudiantes dedicados de lleno a sus estudios. Indica usted que este no es el caso en lo relativo a la Escuela de Derecho de la Universidad Interamericana. Parecería desprenderse de su comunicación que prefieren ustedes concentrar todos sus esfuerzos, al menos de inmediato, en establecer una escuela nocturna de alta calidad. En tal caso y luego de conocer con mayor detenimiento las circunstancias

dentro de las cuales se desenvuelve su programa, podría resultar necesario reconsiderar el texto de las normas.

El mínimo de cuatro años en la escuela nocturna que se requiere en el párrafo *b*, corresponde a la diferencia ya indicada entre los estudios de tiempo completo y los que no lo son. La regla asume que quienes estudian en una escuela nocturna lo hacen por encontrarse comprometidos durante el día en otras actividades. La experiencia indica que en casos donde medien tales compromisos el estudiante de Derecho necesita un plazo mayor que el plazo de tres años requerido en todas partes del alumno cuya única responsabilidad consiste en estudiar. Por otra parte, la regla responde a un propósito y a una cautela ya descritos. Si las circunstancias de trabajo diurno no están presentes en el caso de sus estudiantes, parecería razonable reexaminar la justificación en ese caso del requisito de cuatro años que hemos fijado como mínimo en las escuelas nocturnas."

Es interesante apuntar que las dos instituciones acreditadoras de carácter nacional en los Estados Unidos expresan normas en términos de años en vez de semestres o trimestres. La "American Bar Association" en sus "minimum Standards for Legal Education", apartado 1 (b) exige:

"It (the school) shall require its students to pursue a course of three years' duration if they devote substantially all of their working time to their studies, and a longer course equivalent in the number of working hours, if they devote only a part of their working time to their studies."

Esto ha sido interpretado por el "Council of the Section on Legal Education of the American Bar Association" como sigue:

"The curriculum and schedule of work of a full-time course shall be so arranged that substantially the full working time of students is required for a period of three years of at least thirty weeks each. A part-time course shall cover a period of at least four years of not less than thirty-six weeks each year."

Y la "Association of American Law Schools" en su sección 6-2 dice:

"*Requirements*. A member school and a school to be acceptable for admission shall:

.     .     .     .     .     .     .     .

3. Require at least three years of law study for graduation of full-time students and four years for part-time students."

Por todo lo expresado, e independientemente del hecho de que no se cumple con el requisito del programa diurno, el Comité estima que la Escuela de Derecho de la Universidad Interamericana, al ofrecer un programa nocturno en tres años en lugar de cuatro, no cumple con la Norma B.

## Norma C

EN UNA ESCUELA GRADUADA ACREDITADA PARA LA ENSEÑANZA DEL DERECHO SE ACEPTARAN SOLO AQUELLOS SOLICITANTES QUE HAYAN OBTENIDO UN GRADO ACADEMICO DE BACHILLER O SU EQUIVALENTE EN UNA INSTITUCION DE ENSEÑANZA SUPERIOR ACREDITADA O RECONOCIDA POR EL CONSEJO SUPERIOR DE ENSEÑANZA Y QUE HAYAN DEMOSTRADO TENER SUFICIENTE CAPACIDAD E INTERES PARA CONTINUAR ESTUDIOS GRADUADOS SEGUN SE INFIERA DE SU INDICE ACADEMICO, DEL RESULTADO DE PRUEBAS NORMALIZADAS DE APTITUD Y APROVECHAMIENTO Y DE OTROS METODOS EVALUAR Y OBTENER INFORMACION SOBRE EL PARTICULAR.

La escuela cumple con esta norma en lo que se refiere a exigir que los candidatos a admisión posean un grado académico de bachiller. El Comité ha podido comprobar que la Escuela no aplica un criterio selectivo de admisión y no considera sistemáticamente aquellos factores objetivos de los cuales se puede inferir "suficiente capacidad e interés para continuar estudios graduados". Según la norma, estos factores son: el índice académico y el resultado de pruebas normalizadas de aptitud y aprovechamiento.

Del total de los candidatos aceptados para comenzar sus estudios en agosto de 1961, enero de 1962, y agosto de 1962, los que se aceptaron con un índice académico de menos de 2.5 representaron el 62%, el 55% y el 63% respectivamente; y los que se aceptaron con un índice académico entre 2.5 y 2.99 representaron el 31 %, el 37% y el 34% respectivamente. Los

candidatos con 3.00 ó más de promedio representaron el 7%, el 8% y el 3% de las respectivas clases. Un promedio de 2.5 equivale a C y un promedio de 3.00 equivale a B. Esto ofrece un contraste con las calificaciones obtenidas por el estudiantado durante el trimestre enero-abril de 1962, que fueron: A-17%, B-45%, C-29%, D-4% y F-4%; o sea que el 62% obtuvo calificaciones de B o más.

El promedio universitario general no es el único criterio indicativo de la idoneidad de los candidatos a admisión, y el Comité llevó a cabo un estudio adicional basado en los resultados obtenidos en el "Law Aptitude Test" de Princeton por los únicos setenta solicitantes admitidos en agosto de 1961, y enero de 1962, que lo habían tomado previamente. De estos 70 candidatos, 35% obtuvo una calificación inferior a 250 en dicho examen, y 40% obtuvo una calificación entre 250 y 299. De acuerdo con las estadísticas publicadas por la entidad auspiciadora—la Educational Testing Service—sólo el 5% de un total de 101,992 candidatos examinados entre 1957 y 1962 obtuvo una calificación inferior a 300.

La escala de la prueba de Princeton fluctúa entre un mínimo de 200 y un máximo de 800. La tabla general comparativa entre 1957 y 1962 es la siguiente:

| Puntuación Recibida | Porciento de candidatos con puntuación inferior |
|---|---|
| 725 | 99.6 |
| 700 | 99 |
| 675 | 97 |
| 650 | 95 |
| 625 | 92 |
| 600 | 87 |
| 575 | 81 |
| 550 | 74 |
| 525 | 66 |
| 500 | 57 |
| 475 | 47 |

| Puntuación Recibida | Porciento de candidatos con puntuación inferior |
|:---:|:---:|
| 450 | 38 |
| 425 | 29 |
| 400 | 22 |
| 375 | 16 |
| 350 | 11 |
| 325 | 7 |
| 300 | 5 |
| 275 | 3 |
| 250 | 2 |

Las autoridades de la Escuela han hecho saber que, a partir del trimestre en curso, no se aceptarán candidatos que no hayan tomado la prueba de Princeton. No se ha informado si se requerirá una calificación mínima en la misma.

Según información suministrada al Comité, la Escuela determinó la idoneidad de algunos candidatos mediante cartas de recomendación y entrevistas con el Decano.

Creemos imprescindible formular algunos comentarios sobre el grupo de cien estudiantes que ingresaron en clases avanzadas en agosto de 1961, y que procedían de escuelas de derecho no reconocidas. A cada uno de estos estudiantes se le permitió convalidar hasta 9 asignaturas mediante un procedimiento establecido durante el verano de 1961, y que las propias autoridades de la Escuela consideran como sui generis. Por carta del 3 de octubre de 1962, el Decano Lic. Marcano informó al Comité la norma que siguió la Escuela sobre el particular:

"Todo estudiante que haya aprobado cursos en una escuela no acreditada tendría que repetir tales cursos en nuestra escuela y aprobar el correspondiente examen final pero en consideración al hecho de que ya ha aprobado esos cursos bajo la dirección de competentes profesores, aunque en escuelas no acreditadas, nuestra Facultad le ofrecerá cursos intensivos de repaso de veinte horas académicas de duración, al final de los cuales se les dará

un examen de toda la materia del curso y el estudiante será aprobado conforme a su nota en tal examen. Ningún estudiante que haya aprobado un curso en una de esas escuelas no acreditadas con menos de "C" cualifica para tomar los cursos de repaso y todos tendrán que cumplir los demás requisitos de admisión."

Por este método se ofrecieron nueve asignaturas durante el verano de 1961. Algunos estudiantes convalidaron hasta nueve cursos, lo cual equivale a un año de estudios de derecho. En total, los cien estudiantes trataron de convalidar 400 cursos y fracasaron solamente en cuatro: un promedio de fracasos del 1% para todo el proceso. ([10])

Aunque el Decano Lic. Marcano ofreció su cooperación para obtener los exámenes de convalidación y las contestaciones a los mismos, este material nunca se ha puesto a la disposición del Comité.

El Comité concluye que la Escuela de Derecho de la Universidad Interamericana cumple con lo relativo al requisito de la posesión de un bachillerato o su equivalente obtenido en una institución acreditada, pero que no cumple con los demás requisitos establecidos por el Consejo Superior en la Norma C.

## Norma D

LA FACULTAD DE UNA ESCUELA GRADUADA ACREDITADA PARA LA ENSEÑANZA DEL DERECHO DEBE ESTAR INTEGRADA POR MAESTROS IDONEOS. POR LO MENOS SEIS MAESTROS, INCLUYENDO AL DECANO, DEBEN LLEVAR A CABO UN PROGRAMA DE TRABAJO COMPLETO DEDICADO A LA LABOR DOCENTE, QUE INCLUIRA LA ENSEÑANZA, INVESTIGACIONES, ESTUDIOS Y ESCRITOS RELACIONADOS CON EL DERECHO.

La facultad de la Escuela durante el trimestre mayo–agosto 1962, estuvo constituida por los siguientes profesores

([10]) Debe señalarse que el Reglamento de la "Association of American Law Schools" dispone lo siguiente relativo a la convalidación de cursos aprobados en escuelas de derecho no acreditadas por esa entidad ni por la American Bar Association: "*Advanced Standing*. Non Member Schools. A member school shall not accept for advanced standing credit earned at a school which is not a member of the Association or provisionally approved by the American Bar Association."

(el número equivale a horas de cátedra por semana) : Lic. Benjamín Ortiz (5), R. Ramírez Pabón (7), J. B. Fernández Badillo (6), F. Pagán Rodríguez (8), J. C. Santiago Matos (8), Basilio Santiago (5), Domingo Toledo (5), y Carmen Pura Jiménez (2), quien es a la vez bibliotecaria de la Escuela.

Durante el trimestre en curso (agosto–diciembre 1962) ocupan la cátedra los Lcdos. Ortiz (14), Ramírez Pabón (10), Pagán Rodríguez (10), Santiago Matos (10), Santiago (3), Toledo Alamo (10), Jiménez (2), y los siguientes que no enseñaron el trimestre pasado: Lcdos. Elfrén Bernier (4), A. Fiol Negrón (9), Orzábal Quintana (2), Vincent Rotolo (2), y el Decano Marcano (2).

El Decano Marcano considera profesores de tarea completa a los Lcdos. Ramírez Pabón, Fiol Negrón, Pagán Rodríguez, Toledo Alamo y Jiménez. Clasifica como profesores sobre quienes hay controversia en cuanto a si son de tiempo completo o tiempo parcial a los Lcdos. Benjamín Ortiz y J. C. Santiago Matos; y como profesores de tarea parcial a los Lcdos. Fernández Badillo, Basilio Santiago, Elfrén Bernier, Arturo Orzábal Quintana y Vincent Rotolo. [11]

Las autoridades de la Universidad Interamericana han expresado dudas acerca de la interpretación que ha de dársele a la frase "un programa de trabajo completo dedicado a la labor docente" que según la norma de epígrafe concierne a "por lo menos seis maestros, incluyendo al Decano". En carta dirigida al Hon. Cándido Oliveras el 19 de octubre de 1961, el Lic. Marcano se expresó así sobre el particular:

"Nos referimos ahora al párrafo *d*. Estamos perfectamente de acuerdo con el mismo. Sin embargo, la definición de lo que es un Profesor con un 'programa de trabajo completo dedicado a la labor docente . . .' requiere un nuevo examen y evaluación cuando se aplica a una Escuela de Derecho nocturna exclusiva-

---

[11] Carta de 8 de octubre, 1962, del Decano Lic. Marcano al Secretario del Comité.

mente. Nuestros profesores con programa de tiempo completo se dedican exclusivamente a la tarea docente, incluyendo investigaciones y estudios, durante las horas de trabajo académico nocturno y aún parte de las horas diurnas, pero no podríamos requerirles que se dediquen a estas labores durante todas las horas del día y también durante la noche. Resultaría entonces que su programa sería no ya de tiempo completo sino de doble tiempo."

"En el mundo académico hay distinguidos profesores que enseñan su programa de tiempo completo diurno, pero disponen libremente de su tiempo nocturno y finales de semana. Y aún hay algunos, que luego de terminada su tarea completa, disponen de su tiempo libre para actividades profesionales que son el complemento a sus estudios, investigaciones y escritos relacionados con el Derecho y con la práctica de la profesión. Es así como las Escuelas de Derecho cuentan en su Profesorado con sobresalientes figuras del Foro, que prestigian la cátedra, y quienes en otra forma no podrían prestar sus servicios a la función universitaria y a la juventud. Indudablemente que la intención del Consejo no fué colocar a una Escuela nocturna en la posición onerosa de que su Facultad de tiempo completo tenga que dedicar todas las horas de la noche académica y también las del día a su noble tarea universitaria."

El Rector de la Universidad de Puerto Rico tuvo a bien aclarar este punto suscitado por el Decano Lic. Marcano, mediante el siguiente comentario:

"la respuesta relativa a su planteamiento acerca del párrafo *d,* está implícita en las consideraciones anteriores. No cumple el requisito de tarea completa el profesor que trabaja regularmente en el ejercicio de su profesión, en su bufete, en el gobierno, o en cualquier otro menester de esa naturaleza aun cuando dedicara todas las horas de la noche a sus labores en la Escuela de Derecho."

(Rector Benítez al Decano Lic. Marcano
28 de diciembre de 1961)

Tres meses más tarde el Decano Lic. Marcano reiteró su posición en los siguientes términos: (Lic. Marcano al Rector Benítez, 20 de marzo de 1962)

"Empero, no hemos clarificado la importante cuestión de lo que significa el concepto 'profesor de tarea completa' en una Escuela de Derecho nocturna exclusivamente. Usted recordará que cambiamos ideas sobre este extremo y que nosotros fijamos claramente nuestra posición en cuanto a lo que a nuestro juicio significa tarea de tiempo completo para un profesor en una escuela como la nuestra. Es de básica importancia que tal extremo sea debidamente aclarado. A lo largo de los próximos tres años, nosotros iremos aumentando nuestro claustro a tono con el crecimiento y necesidades de nuestra escuela y necesitamos una norma para guiar nuestra acción en ese sentido. Tal norma debe considerar entre otros factores, la necesidad de que los estudiantes puedan recibir su enseñanza de profesores eruditos y consagrados en las materias que practican y explican e igualmente la calidad de la educación legal que deseamos ofrecer a los estudiantes para que sirvan a nuestro pueblo en su desenvolvimiento social y jurídico. Tampoco esa norma debe pecar de tal rigidez o limitación al aplicarse a una Escuela de Derecho nocturna que prive al estudiantado y a la Facultad de los servicios de tiempo completo de profesores de esa calidad profesional o que les requieran su dedicación al profesorado—no ya durante tiempo completo por la noche, sino también durante todas las horas del día. Tal requisito los convertiría en profesores de tiempo doble en vez de profesores de tiempo completo y resultaría un impedimento oneroso para el crecimiento de la vida institucional y académica de una escuela nocturna."

Durante el trimestre en curso los profesores que la Escuela considera de tarea completa enseñan los siguientes cursos:

*Lic. Benjamín Ortiz* (14 horas semanales)
Introducción al Derecho (2 secciones)
Evidencia
Contratos de Derecho Común
Responsabilidad Civil Extracontractual

*Lic. Ramírez Pabón* (10 horas semanales)
Obligaciones y Contratos (2 secciones)
Práctica Forense

*Lic. Fiol Negrón* (9 horas semanales)
    Procedimientos Legales Especiales
    Sucesiones (2 secciones)

*Lic. J. C. Santiago Matos* (10 horas semanales)
    Procedimiento Civil
    Derecho Constitucional
    Derecho Administrativo (2 secciones)

*Lic. Toledo Alamo* (10 horas semanales)
    Derecho de Familia (2 secciones)
    Derecho Hipotecario

*Dr. Pagán Rodríguez* (10 horas semanales)
    Derecho Penal (2 secciones)
    Procedimiento Criminal
    Seminario Derecho Penal

*Lic. Carmen Pura Jiménez* (Bibliotecaria)
    Bibliografía Legal

De los siete profesores mencionados, solamente los Lcdos. Fiol Negrón, Ramírez Pabón y Toledo Alamo se dedican principalmente a la cátedra. De los restantes, el Lic. Ortiz es Legislador, destacado líder político, presidente y miembro de comités legislativos y profesional activo; el Lic. Santiago Matos es Jefe de la División de Litigios Contributivos del Departamento de Justicia, una de las dependencias gubernamentales en Puerto Rico que mayor volumen de trabajo tiene; el Dr. Pagán Rodríguez es Redactor-Jefe de la Comisión de Reforma Penal; y la Lic. Jiménez ocupa un cargo de ocho a doce de la mañana en la Corporación de Renovación Urbana y Vivienda.

La cuestión aquí planteada no es nueva; ha sido considerada previamente por otras instituciones acreditadoras. Las normas de la American Bar Association requieren de las escuelas de derecho que posean "among its teachers a sufficient number giving their entire time to the school to insure

actual personal acquaintance and influence with the whole student body" ([12])

Por su parte, la Association of American Law Schools dispone:

"A full-time teacher is one who devotes substantially his entire time to his responsibilities as a teacher, scholar, and educator, broadly conceived to include limited professional activities outside the law school that contribute to the faculty's fulfillment of the criteria for a competent faculty set out in Section II-1, if such outside activities are sufficiently limited that the teacher's basic faculty duties remain in fact his primary interest and responsibility."

"A faculty member should not teach more than an average of eight hours per week." ([13])

La Norma D del Consejo Superior de Enseñanza requiere que el Decano de una escuela de derecho que aspire a ser acreditada deberá "llevar a cabo un programa de trabajo completo dedicado a la labor docente". Idéntica norma con-

---

([12]) Minimum Standards of the American Bar Association for Legal Education, (1) d.

([13]) Un Comité Especial sobre la Administración de Escuelas de Derecho de la AALS se expresó recientemente así con relación a los profesores de tiempo parcial: "Scholarly practitioners. of law can undoubtedly be used to great advantage as part-time teachers for courses which demand a more intimate insight into the practice of law. Many full-time teachers either have never acquired the practical experience demanded by such courses or have lost all contact with the practice of law. Part-time teachers act as a leaven in a sometimes too academic dough, both for students and for the full-time faculty. Particularly in large urban areas, men with highly specialized experience can be obtained as part-time teachers.

On the other hand, part-time men are not professional teachers. By reason of other commitments, they are usually not available for frequent consultation by students and may be lacking in immediate preparation for their classes, while the presence of some part-time teachers in a school (and particularly in a part-time division) makes it more difficult to carry out a sound educational program in a truly academic atmosphere. The averages provided by the decanal inquiry indicate that far too many schools rely too much on the services of part-time teachers. Certainly, economy in time or salaries should not be regarded by any reputable school as an end to be achieved through excessive hiring of part-time teachers." *Anatomy of Legal Education*, págs. 322, 323 (1961).

tienen los reglamentos de la Association of American Law Schools. ([14])

La dirección intelectual y administrativa de la Escuela de Derecho de la Universidad Interamericana la desempeña el Lic. Hipólito Marcano, quien es a la vez senador, destacado líder político, obrero y religioso, y profesional activo. Tiene además a su cargo la cátedra de Derecho Laboral.

Una encuesta reciente auspiciada por la Association of American Law Schools reveló que "The deans estimate the average actual faculty work week at 52.94 hours . ."([15]) Esta cifra cubre la tarea de un profesor que se dedica esencialmente a la cátedra incluyendo la investigación, preparación de escritos y monografías, consulta con estudiantes, y participación en otras actividades necesarias para la formación de los futuros profesionales.

En la Escuela de Derecho de la Universidad Interamericana sólo hay actualmente tres profesores que podrían disponer de un número de horas adecuado para dedicar a la labor docente cada semana. Los otros cuatro profesores considerados de "trabajo completo" por la Escuela, y el Decano, no disponen de tiempo suficiente para llevar a cabo su labor docente como profesores de tarea completa.

La concentración diaria y anual de cursos y la situación antes descrita contribuye a la superficialidad de la enseñanza que hemos apuntado anteriormente.

El Comité estima que la Escuela no cumple con lo dispuesto en la Norma D.

*Norma E*

LA MAYORIA DE LOS MAESTROS CON PROGRAMA DE TRABAJO COMPLETO DEBEN POSEER GRADOS ACADEMICOS POR ESTUDIOS AVANZADOS DE DERECHO RECIBIDOS DE UNIVERSIDADES ACREDITADAS O RECONOCIDAS POR EL CONSEJO SUPERIOR DE

---

([14]) *II-5. Full-time Dean*—Except in case of emergency a member school shall not have as its administrative head or dean a person who devotes less than full-time to the work of administration and instruction.

([15]) AALS Proceedings 1961, pág. 61.

ENSEÑANZA O HABER DEMOSTRADO SU CAPACIDAD COMO ESTUDIOSOS DEL DERECHO. ADEMAS DE LOS MAESTROS CON PROGRAMA DE TRABAJO COMPLETO, CUANDO LAS NECESIDADES DE LA ESCUELA DE DERECHO LO EXIJAN SE PODRAN UTILIZAR LOS SERVICIOS DE MAESTROS CON PROGRAMAS DE TRABAJO LIMITADOS.

Ninguno de los profesores que el Comité estima son de tarea completa posee "grados académicos por estudios avanzados de derecho" aunque el Comité coincide con el criterio de la Escuela en el sentido de que "una mayoría (de éstos) . . . han demostrado su capacidad como estudiosos del Derecho". Considerando esta norma conjuntamente con la norma precedente, que exige el cumplimiento de estos requisitos por la mayoría de una facultad compuesta de "por lo menos seis maestros incluyendo al Decano", el Comité concluye que la Escuela no cumple con esta Norma.

*Norma F*

LA BIBLIOTECA DE UNA ESCUELA GRADUADA ACREDITADA PARA LA ENSEÑANZA DEL DERECHO CONTENDRA NO MENOS DE 12,500 VOLUMENES EN BUENAS CONDICIONES Y SELECCIONADOS DE ACUERDO CON LAS NECESIDADES DE LA ENSEÑANZA Y LA PRACTICA DEL DERECHO EN PUERTO RICO. ESTA CANTIDAD DE LIBROS SE AUMENTARA EN MIL VOLUMENES TODOS LOS AÑOS. ADEMAS, TODOS LOS AÑOS SE HARA DESEMBOLSO NO MENOR DE $8,000 PARA LA ADQUISICION DE NUEVOS LIBROS PARA LA BIBLIOTECA.

Hasta que no se termine el inventario que se está efectuando en la biblioteca no se sabrá el número exacto de volúmenes con que cuenta actualmente la Escuela. Aproximadamente hay entre 10,000 y 12,000 volúmenes al finalizar el tercer año de enseñanza y la Escuela está en vías de satisfacer esta exigencia.

La biblioteca ya cuenta con una buena selección de libros que incluye las siguientes colecciones: National Reporter, American Digest, American Law Reports, American Jurisprudence, Corpus Juris Secundum, el citario de Shepard y alrededor de 250 volúmenes relacionados con el Derecho Civil.

También están completas y se mantienen al día las siguientes revistas: American Bar Association Journal, California Law Review, Columbia Law Review, Law and Contemporary Problems, Michigan Law Review, Yale Law Journal and the Journal of Criminal Law and Criminology. Se han ordenado cinco de las mejores revistas jurídicas en español al igual que los repertorios de jurisprudencia estatal anteriores al National Reporter System.

Queda por añadir nuevas colecciones de revistas jurídicas, libros de texto, y materiales de derecho civil. Se nos ha informado que la Profesora Jiménez o el Decano se trasladarán a España este invierno para hacer algunas compras.

*Gastos Previos y Presupuesto Actual*

Informa la Escuela que hasta el 1 de noviembre de 1962, se había gastado en libros la cantidad de $62,415.54. El presupuesto de la Biblioteca para el año académico 1962–63 es de $31,920 desglosado en la siguiente forma:

| | | |
|---|---|---|
| (a) | Salarios incluyendo el de la Bibliotecaria .... | $12,600 |
| (b) | Equipo ......................................................... | 800 |
| (c) | Libros y Suscripciones ................................... | 18,000 |
| (d) | Materiales de Oficina ................................... | 400 |
| (e) | Misceláneas ................................................. | 120 |
| | | $31,920 |

El espacio destinado a la biblioteca se está ampliando para acomodar 5,000 volúmenes adicionales. También se habilitarán dos cuartos para el uso de la bibliotecaria y la catalogadora.

El horario de la biblioteca es el siguiente: Días laborables de 1:00 P.M. a 10:30 P.M.; sábados, domingos y días festivos de 8:00 A.M. a 5:00 P.M. Hasta hace poco la Biblioteca abría a las 5:00 P.M. los días laborables en lugar de a la 1:00 P.M.

El Comité estima que la Escuela está en vías de cumplir sustancialmente con la norma de referencia.

*Norma G*

LA BIBLIOTECA SERA ORGANIZADA Y DIRIGIDA POR UN BIBLIO-
TECARIO IDONEO DEDICADO TOTALMENTE A ESTA FUNCION Y
CONTARA, ADEMAS, EN NUMERO SUFICIENTE, CON EL PER-
SONAL TECNICO COMPETENTE NECESARIO PARA SU FUNCIO-
NAMIENTO ADECUADO.

La Biblioteca está hábilmente dirigida por la Lic. Carmen Pura Jiménez, quien es diplomada en Derecho y Ciencia Bibliotecaria. Oficialmente, la Lic. Jiménez trabaja de 6:30 a 10:30 de la noche, de lunes a viernes, pero frecuentemente dedica a la biblioteca parte de su tiempo libre por las tardes y durante los fines de semana. La bibliotecaria además ocupa un cargo en la Corporación de Renovación Urbana y Vivienda, de 8:00 a 12:00 de la mañana.

La Bibliotecaria de la Escuela está asistida por el siguiente personal:

1) un estudiante de tercer año que trabaja entre la 1:00 y las 5:30 de la tarde, de lunes a viernes, y frecuentemente trabaja horas extras por su cuenta;

2) un estudiante de segundo año que trabaja los sábados, domingos y días festivos de las 8:00 de la mañana a las 5:00 de la tarde;

3) una catalogadora que trabaja oficialmente de 5:00 de la tarde a 10:30 de la noche de lunes a viernes. Suele trabajar los fines de semana en la biblioteca por su cuenta. No posee un grado en Ciencia Bibliotecaria, pero tiene 20 años de experiencia trabajando como catalogadora en la Biblioteca Carnegie y en la Junta de Planificación, donde trabaja durante el día;

4) un encargado de la circulación que también ha trabajado en la Biblioteca Carnegie, es estudiante de Derecho y ha aprobado el curso de Bibliografía Legal, y trabaja oficialmente de 5:30 a 10:30 P.M.

En términos generales la Escuela cumple parcialmente con esta norma.

Con respecto al requisito que exige dedicación total a la biblioteca por parte de la bibliotecaria, la Escuela no está cumpliendo con la Norma G. El Comité tiene dudas en cuanto

a si el personal técnico de la biblioteca es suficiente para cubrir las necesidades de una biblioteca en formación. ·

## CONCLUSIÓN

En su proceso de evaluación el Comité ha considerado detenidamente cada una de las normas de acreditación establecidas por el Consejo Superior de Enseñanza y está consciente de que este proceso supone la consideración conjunta de todos los requisitos mínimos y no meramente una aplicación mecánica y aislada de las normas. Aunque la Escuela Interamericana cumple sustancial y parcialmente con dos de las siete normas, el Comité estima que no cumple con las normas esenciales al logro de los objetivos establecidos por el Consejo Superior.

La forma en que comenzó a funcionar la Escuela—admitiendo estudiantes avanzados y acreditándoles cursos en escuelas de derecho no reconocidas—el concepto de "profesor de tarea completa" sustentado por la institución, el contenido y el método de regentear las cátedras, los criterios utilizados en la selección del estudiantado, la ausencia de rigor intelectual en el estudio, el concepto que se tiene de lo que debe ser la educación y formación de los abogados, el tipo de examen ofrecido y la calificación de los mismos, nos obligan a concluir que la Escuela Interamericana no satisface los requisitos que, en conjunto, son imprescindibles para merecer la acreditación del Consejo Superior.

A nuestro juicio el objetivo de las normas de acreditación del Consejo Superior es establecer aquellos requisitos esenciales para garantizar a la comunidad la calidad necesaria en los centros de enseñanza de derecho de modo que los estudiantes reciban la formación intelectual esencial a la práctica de la abogacía. El crecimiento espiritual y material de nuestro país exige el entrenamiento de profesionales competentes. La participación destacada de los abogados en el orden público y privado de nuestra sociedad justifican el celo de nuestro Tribunal Supremo y del Consejo Superior de Enseñanza por la calidad y el clima de exigencia intelectual que debe prevalecer

en las instituciones dedicadas a la enseñanza del derecho. Estos niveles de excelencia no pueden ni deben sacrificarse, a pesar de la necesidad que tiene el país de un mayor número de abogados y de la condición precaria en que se han colocado aquellos estudiantes que de buena fe se matricularon en una escuela de derecho que, como revela la evaluación que precede, no cumple, ni ha cumplido nunca desde sus comienzos, con las normas del Consejo Superior de Enseñanza.

Respetuosamente sometido,

(Fdo.) Abrahán Díaz González, *Presidente*

(Fdo.) José M. Canals, *Secretario*

(Fdo.) Lino J. Saldaña

(Fdo.) Margaret Hall

Río Piedras, Puerto Rico
21 de diciembre de 1962

RESPUESTA DEL DR. RONALD C. BAUER, PRESI-
DENTE DE LA UNIVERSIDAD INTERAMERICANA,
EN RELACION CON EL PROCESO DE ACREDITACION
DE LA FACULTAD DE DERECHO DE DICHA INSTITU-
CION EDUCATIVA*

*Palabras Preliminares*

Normalmente todo lo atingente a la acreditación de un
centro de enseñanza superior se mantiene ante. el foro aca-
démico apropiado y, en caso necesario, ante la instancia judi-
cial correspondiente. Sin embargo, un informe preliminar,
conteniendo información errónea sobre la acreditación de la
Facultad de Derecho de la Universidad Interamericana, ha
sido entregado a un segmento de la Prensa. Aunque resulta
tan desagradable la sustracción de este asunto de su foro
natural, nuestra universidad no tiene otra alternativa que
fijar claramente su posición ante la opinión pública.

*Seis Puntos Básicos*

Antes de responder específicamente a la información dada
a la Prensa, deseo enfatizar seis puntos básicos:

1—La Facultad de Derecho de la Universidad Interameri-
cana no ha sido "rechazada" ni se le ha negado acreditación,
como erróneamente se ha informado a la Prensa. El caso está
"SUBJUDICE", ya que la resolución del Consejo Superior de
Enseñanza no hace COSA JUZGADA.

2—El Tribunal Supremo de Puerto Rico enmendó sus
reglas y determinó que, independientemente de la acción que
pueda tomar el Consejo Superior de Enseñanza, es el propio
Tribunal el que hará la determinación final sobre los aspi-
rantes al ejercicio de la profesión de abogado. Eso quiere decir
que los graduados de la Facultad de Derecho de la UI tendrán
iguales oportunidades que los graduados de otras escuelas,
mientras este asunto esté pendiente.

---

*Publicado en *El Mundo*, en su edición del miércoles 17 de abril de 1963.

3—Las normas de admisión y los *standards* académicos de la Facultad de Derecho de la UI son iguales a los de las otras Escuelas de Derecho en Puerto Rico.

4—La planta física de nuestra Facultad es definitivamente adecuada. Nuestra biblioteca legal es de las mejores en Puerto Rico.

5—Nuestra Facultad cuenta con un claustro de profesores de primera calidad, todos los cuales son abogados admitidos al foro y de alta distinción como profesionales y maestros.

6—Ha habido un marcado fracaso, por parte de los llamados a proveer liderato profesional educativo, en la evaluación de nuestra Facultad de Derecho. Fracasaron en el proceso para obtener los hechos ciertos; han torcido la verdad y han ignorado los procedimientos usuales de acreditación.

*Filosofía Educativa de la UI*

La aguda controversia que ha suscitado este asunto revela una diferencia básica en política educativa, entre la Universidad Interamericana y sus críticos.

Debe recordarse que la Universidad Interamericana fue la primera institución universitaria de Puerto Rico en ser acreditada por la "Middle States Association of Colleges and Secondary Schools."

Durante más de 50 años ha sido la pionera en ofrecer las más amplias oportunidades de educación universitaria posibles a todos los puertorriqueños. Creemos que no debe haber límite a las oportunidades disponibles para cualquier persona, tanto jóvenes como adultos, con habilidad y deseos de sacrificar tiempo y aprovechar facilidades para hacerse de una educación universitaria.

La inversión más provechosa para la Democracia la constituye la máxima educación del pueblo. Una democracia sólo puede asegurar su futuro reinvirtiendo continuamente sus máximos esfuerzos y recursos en la educación. Eso es doblemente cierto para una democracia en una área que está en continuo desarrollo, como Puerto Rico.

Se ha dicho, repetidamente, que la mayor riqueza de Puerto Rico, la constituye su pueblo. La adhesión a esta creencia debe reflejarse en la política educativa. Éste es el corazón de la filosofía educativa de la Universidad Interamericana.

## Faltan Más Abogados

Puerto Rico decididamente necesita más abogados. El presente número de juristas no es suficiente para servir adecuadamente a las crecientes necesidades del país. El Canciller de la Universidad de Puerto Rico, licenciado Jaime Benítez, en un discurso pronunciado en la sesión inaugural del Congreso Interamericano de Derecho Procesal, celebrado en San Juan, P.R., en junio de 1962, dijo lo siguiente:

"La Facultad de Leyes es la más reducida, y en tamaño podríamos decir minúscula, de todas las Facultades universitarias. Es, creo yo, la Universidad de Puerto Rico, la única institución de habla española donde se da el insólito porcentaje dentro del cual de 22,000 alumnos, como tenemos en la actualidad, solamente 400 estudian la carrera de Derecho.

Y en nuestra tierra, en Puerto Rico, los abogados, los licenciados en Derecho, constituyen la profesión numéricamente más reducida de todas las demás profesiones fundamentales. Hay en Puerto Rico menos abogados que médicos, hay en Puerto Rico más ingenieros que abogados, hay en Puerto Rico más profesores de tiempo completo en la Universidad que abogados."

Para cubrir esta necesidad la Universidad Interamericana fundó su Facultad de Derecho, dotándola de un claustro prestigioso, de una biblioteca de primera clase y de un edificio céntrico y funcional.

## La Ley de Acreditación

Al solicitar la acreditación de su Facultad de Derecho, la Universidad Interamericana se ha confrontado con una situación legal y educativa que plantea unas cuestiones muy serias para todas las instituciones privadas de educación superior universitaria en Puerto Rico.

En virtud de lo dispuesto en la Ley Núm. 88 de abril 25 de 1949, la Universidad de Puerto Rico, y solamente la Universidad de Puerto Rico, es la única agencia para acreditar a otros colegios y universidades privadas en la Isla.

No sabemos de jurisdicción alguna, en el mundo, donde la acreditación de colegios y universidades depende de la discreción o voluntad de la universidad del estado.

Cuestionamos enfáticamente la sabiduría de tal sistema para el mejor desarrollo de una sana, libre y democrática política cultural y educativa.

### El Proceso de Acreditación

El 12 de diciembre de 1960 el Hon. Tribunal Supremo de Puerto Rico delegó en el Consejo Superior de Enseñanza la potestad de acreditar colegios de derecho en Puerto Rico. De conformidad con tal delegación, peticionamos al Consejo el reconocimiento de nuestra Facultad, luego de pertinentes aclaraciones de las reglas aprobadas al efecto.

El Consejo, a su vez, aprobó unas normas de acreditación propuestas por el Rector Jaime Benítez, de la Universidad de Puerto Rico. Mediante dichas normas delegaron el mandato del Tribunal Supremo, esta vez en el propio Rector, quien nombró un "Comité de Acreditación", compuesto por tres profesores de su propio Colegio de Leyes (Profesores José M. Canals, Lino J. Saldaña y Margaret Hall), y dos abogados postulantes (los Lcdos. Manuel Abréu Castillo y Abrahán Díaz González).

El Lic. Abréu Castillo renunció como miembro del Comité, al ser electo Presidente del Colegio de Abogados de P. R., en septiembre de 1962, y antes de que se redactara el informe y se sometiera el mismo al Rector. A pesar de haber sido el más diligente de los miembros del Comité, no fue consultado en las deliberaciones sobre el Informe.

El Decano David Helfeld, de la Escuela de Leyes de la Universidad de Puerto Rico, fue nombrado Consejero del Comité,

cuyo nombramiento no fue informado a las autoridades de nuestra Facultad de Derecho hasta el 6 de octubre de 1962.

El Comité fue encargado de reunirse regularmente con las autoridades de la nueva escuela de derecho, para aconsejarla y orientarla en el cumplimiento de las normas de acreditación aprobadas por el Consejo, a recomendación del Rector.

*Violaron Instrucciones*

En contravención a tales instrucciones, el Comité se reunió con el Decano de nuestra Facultad de Derecho dos veces solamente, durante el año de 1962. Nunca se reunió con la Facultad. Nunca se reunió con el Presidente o con la Universidad. Pidió voluminosos documentos e información detallada, que le fue suplido. Algunos miembros del Comité visitaron breve y esporádicamente algunas clases.

El 23 de diciembre de 1962, el Comité sometió al Rector Benítez un informe adverso. El Decano de nuestra Facultad de Derecho sometió una extensa réplica a dicho informe. El Rector envió al Consejo Superior de Enseñanza el Informe del Comité, la réplica de nuestro Decano y sus propias recomendaciones.

El Consejo tomó tres decisiones, a saber:

(1) Enmendó las normas de acreditación para autorizar el funcionamiento de Escuelas de Derecho nocturnas.

(2) Determinó que nuestra Facultad no cumple AUN con todas las normas, según fueron enmendadas en esa misma reunión.

(3) Dispuso que tan pronto se hayan corregido las deficiencias, el Consejo procederá a reexaminar el caso.

Ésa es la situación al presente. La Facultad de Derecho de la Universidad Interamericana no ha sido rechazada ni se le ha negado acreditación. Está en el proceso hacia su acreditación. Ahora bien, vamos a examinar el informe del Comité de Acreditación.

*Rebaten Informe*

El informe alega que en nuestra Facultad no existe un "ambiente de dedicación y disciplina intelectual", y añade que "hasta el presente ni la Facultad ni los estudiantes publican una revista jurídica." La primera parte del aserto es abstracta, imprecisa y vaga. La segunda requiere una comparación entre nuestra Facultad y otras escuelas de leyes.

Tomemos el caso del Colegio de Leyes de la Universidad de Puerto Rico, ya que presuntivamente éste debe ser la imagen para las otras escuelas de derecho en la Isla.

La Revista Jurídica de la Universidad de Puerto Rico fue publicada, por primera vez, en marzo de 1932, o sea, 19 años después de haberse fundado el Colegio de Leyes. Nuestra Facultad de Derecho solamente tiene dos años de vida y, sin embargo, ya tiene planes definitivos para la publicación de su Revista Jurídica.

El Comité alega que nuestra planta física es inadecuada y que el calor en los salones de clase es agobiante. Nuestra Facultad de Derecho está localizada en un moderno edificio, de cuatro plantas, en el centro del Area Metropolitana, y ya tenemos planes para la construcción de un nuevo edificio en los amplios terrenos recientemente donados a nuestra Universidad.

Recuérdese que el Colegio de Leyes de la Universidad de Puerto Rico fue fundado en el 1913 y comenzó funcionando en un solo salón en el Edificio Baldorioty. Al año siguiente adquirió un salón adicional. Desde 1913 a 1941 estuvo rodando de sitio en sitio y se alojó en cinco locales distintos. Finalmente, en el 1941, se le trasladó del edificio Janer al antiguo caserón del Instituto del Tabaco, situado en la parte posterior del campus universitario denominado "Siberia" por los estudiantes.

No fue hasta febrero de 1963, y luego de haber cumplido 50 años de vida, que el Colegio de Leyes de la Universidad de Puerto Rico se instaló en su moderno edificio, con aire acondi-

cionado. Le tomó más de medio siglo a la Universidad de Puerto Rico, que cuenta con pródigos fondos públicos en cantidades liberalísimas, construir una planta física adecuada para su Colegio de Leyes.

Esa misma Universidad critica a la Universidad Interamericana por su planta física, moderna y adecuada, adquirida en la misma fecha de la fundación de nuestra Facultad de Derecho.

El informe continúa: "La Facultad de Derecho de la Universidad Interamericana cumple con lo relativo al requisito de la posesión de un bachillerato, o su equivalente obtenido en una universidad acreditada, pero no cumple con el apartado de la norma que requiere la demostración, por el estudiante, de suficiente capacidad e interés para continuar sus estudios graduados, según se infiera, de su índice académico, del resultado de pruebas normalizadas de aptitud y aprovechamiento y de otros métodos de evaluar y obtener información sobre el particular."

*Alta Preparación de Estudiantes*

El hecho cierto es que nuestra Facultad de Derecho ha determinado que los estudiantes deberán aprobar el examen de Princeton con una puntuación no menor de 2.25, cuando la norma regular de dicho examen es una puntuación mínima de 2.00. Cinco de nuestros estudiantes poseen distintos grados de Doctor; 17 tienen grados de Maestro; 19 tienen certificados de estudios post-graduados y 36 han hecho estudios postgraduados para el grado de Maestro.

El 35% de todo el cuerpo estudiantil ha hecho grados avanzados hacia el grado de Maestro. ¿Es esto un signo de inferioridad?

El Comité hizo una comparación entre las notas que los estudiantes obtuvieron en sus estudios de bachillerato y las notas obtenidas en sus estudios de Derecho, alegando que tenían que ser las mismas notas, y que el hecho de que hubiesen obtenido mejores notas en los estudios de leyes demostraba

"falta de exigencia por parte de los profesores." ¿Acaso comparó el Comité las notas de bachillerato de los estudiantes, con las notas obtenidas en sus estudios post-graduados hasta el doctorado? ¿Consideró el Comité el tiempo transcurrido entre la fecha del bachillerato y el presente? ¿No sabe el Comité que la madurez en el estudiante desarrolla el sentido de responsabilidad y mejora la calidad del trabajo escolar graduado?

Pero hay más. Se cuestiona seriamente si existe un criterio válido en pedagogía, para cumplir con la norma establecida por el Consejo, que dispone la previa determinación de la capacidad e interés del estudiante para proseguir estudios avanzados. Dejaremos que sea el propio Asesor del Comité de Acreditación, Dr. David Helfeld, quien conteste esta interrogante. En la Revista Jurídica de la Universidad de Puerto Rico, (Vol. 30, Pág. 19, año 1961, el doctor Helfeld dice textualmente:

"¿Hasta qué punto es posible predecir la aptitud para el estudio legal? Dando por sentado que una absoluta predicción es imposible, y que el más cuidadoso proceso de escrutinio pueda siempre conducir a errores, ¿cómo puede reducirse la incidencia de éstos? En el presente estamos realizando estudios para determinar el valor de predicción de los tres criterios actualmente en boga. Buscamos contestaciones a las siguientes preguntas: ¿Deberá ser eliminado el examen de Princeton, o deberá reducirse su valor en la selección de los candidatos: Hasta qué grado ha sido exacto el valor de predicción dado al examen de ingreso al colegio? ¿Deberán los índices académicos de las diferentes universidades y de las diversas escuelas, dentro de la misma universidad, continuar siendo tratados a base de una igualdad ficticia?

"El descontento con el presente proceso de selección y la búsqueda del criterio más justo posible, son reacciones naturales contra ciertos factores obstinados: primero, el porcentaje de estudiantes que fracasan; segundo, el porcentaje de estudiantes que desertan de las aulas . . .

"El porqué los estudiantes fracasan, y por qué abandonan la escuela por razones no académicas, son interrogantes para las

cuales al presente sólo podemos ofrecer una contestación especulativa."

El Asesor del Comité confiesa que no existe actualmente un criterio válido para predecir la aptitud para los estudios legales. Sin embargo, el Comité de Acreditación critica nuestra Facultad de Derecho porque nosotros no aplicamos ese mismo criterio de predicción de aptitud para el estudio de Derecho.

Procede señalar que ningún estudiante puede matricularse en la Facultad de Derecho de la Universidad Interamericana, si no tiene un grado de Bachiller con un índice académico de 2.00 ó más alto, y no se le permite permanecer en la escuela si no mantiene un índice académico de 2.00.

¿Cómo compara esta norma con el récord del Colegio de Leyes de la Universidad de Puerto Rico? En Río Piedras no se aplicaron normas de admisión ni de permanencia durante los primeros 27 años de vida del Colegio.

Al principio se admitieron estudiantes directamente de escuela superior, y más tarde se les admitía con un curso llamado pre-legal, que no era ni un Bachillerato ni su equivalente.

Además, no se exigían índices académicos ni exámenes de aptitud ni ninguna otra norma de evaluación. No fue hasta 1941 que el Colegio de Leyes de la Universidad de Puerto Rico puso en vigor los mismos requisitos de admisión que nosotros hemos puesto en práctica y seguimos desde que fundamos nuestra facultad.

*Nuestros Graduandos*

De los 32 candidatos a graduación, este año, todos asistieron a otras escuelas de derecho antes de entrar en nuestra Facultad. Sin embargo, no fueron admitidos por las notas obtenidas en esas escuelas no acreditadas. A todos ellos se les requirió tomar cursos de repaso en nuestra Facultad, y luego se les administró un examen general en cada materia, habién-

doseles acreditado el curso por la nota obtenida en nuestro examen final.

Los demás cursos tomados por los estudiantes en esas escuelas no acreditadas fueron repetidos por ellos en nuestro currículo regular. Más de la mitad de estos 32 graduandos han hecho estudios post-graduados después del Bachillerato. Cinco tienen el grado de Maestro; dos tienen el Doctorado; seis son Contadores Públicos Autorizados y cuatro tienen diplomas o certificados profesionales.

Debemos anotar que la Universidad Interamericana sigue el sistema de trimestres, un concepto relativamente nuevo en educación, que se está usando con éxito en varias de las principales universidades de los Estados Unidos. El año académico se divide en tres períodos llamados trimestres, en vez de los períodos clásicos llamados semestres.

Un estudiante de la Universidad Interamericana, que estudia todo el año, bien en la Facultad de Derecho o en las otras facultades, puede llevar a cabo más trabajo en tres años (nueve trimestres) que un estudiante en otra universidad en cuatro años (ocho semestres). Las horas de crédito en un trimestre son exactamente iguales a las de un semestre.

*Preparación Avanzada de Profesores*

El Comité informó, sin comprobarlo, que "ninguno de los Profesores de tiempo completo tiene grados avanzados en el estudio del Derecho". El Comité aparentemente no le preguntó a nuestro Decano, ni a los propios profesores, sobre sus grados académicos avanzados en el estudio del Derecho, antes de hacer un imputación falsa.

La verdad, que el Comité no investigó, es que tanto nuestros profesores de tiempo completo, como los de tiempo parcial, poseen grados académicos avanzados en el estudio del Derecho, o experiencia profesional sobresaliente que equivale o sobrepasa los grados académicos avanzados. He aquí la lista de los siete con más horas de enseñanza:

Lic. Rodolfo Ramírez Pabón....LL.B., Universidad de P.R. 1916, LL.M., Georgetown University, Wash. 1923. Estudios para el grado de Doctor en Derecho, Universidad Autónoma de México. Solamente le faltan unos créditos y la tesis. Además, fue magistrado en nuestra Judicatura, durante 13 años, y Superintendente de Elecciones. Profesor del Colegio de Leyes de la Universidad de Puerto Rico, por varios años.

Lic. Domingo Toledo Alamo.....LL.B., Universidad de P.R. 1927. Un año de estudios post-graduados en Derecho de la Universidad de California. Profesor de Derecho, por 20 años, en la Universidad de Puerto Rico.

Lic. Angel Fiol Negrón........LL.B., Universidad de P.R. 1918. Dieciséis años como magistrado en nuestra judicatura. Registrador de la Propiedad por cinco años. Director Auxiliar de la División de Tierras y Títulos de la Administración de Reconstrucción. Sub-procurador General de Puerto Rico. Jefe de la División de Opiniones del Departamento de Justicia.

Dr. Francisco Pagán Rodríguez. Título de Abogado, Universidad Nacional de la Plata, Argentina 1940. Doctor en Derecho y Ciencias Sociales, Universidad Nacional de Buenos Aires, 1957. Asesor de la Comisión de Reforma Penal de Puerto Rico. Fue Profesor del Colegio de Leyes de la Universidad de Puerto Rico.

Lic. Juan C. Santiago Matos. . . .LL.B., Universidad de P.R. 1940. Estudios post-graduados en Derecho, hacia el Master, en Harvard University. Jefe en la División de Litigios Contributivos del Departamento de Justicia.

Lic. Benjamín Ortiz. . . . . . . . . .A.B., Harvard University 1931, LL.B., Harvard University 1934. Ex-Magistrado de nuestro Tribunal Supremo. Profesor del Colegio de Leyes de la Universidad de P.R. 1938–41.

Lic. Basilio Santiago. . . . . . . . .B.B.A., en Contabilidad de Temple University—1949. LL.B, Tulane University—1955. Estudios post-graduados en Derecho, hacia el Master en Contribuciones, en la Universidad de Nueva York.

Todos nuestros profesores son abogados admitidos a la práctica de la profesión en y fuera de Puerto Rico, y disfrutan de justa nombradía por sus quilates éticos e intelectuales.

*Errores en el Informe*

Deseamos corregir el récord de la información periodística. Nuestro Decano, licenciado Hipólito Marcano, no es un Ministro Protestante, ni laico ni ordenado, como se dijo en la Prensa. Fue Director Regional de la AFL–CIO, pero renunció dicha posición en 1960. Al igual que algunos profesores de tiempo completo del Colegio de Leyes de la Universidad de Puerto Rico, tiene su práctica privada y es Senador.

Es un hombre de una gran habilidad y energía, y de extraordinaria dedicación a los intereses de su pueblo. Está eminentemente cualificado para servir en la educación superior de Puerto Rico.

Comenzando en el próximo trimestre será asistido por un decano asociado de tiempo completo, quien dedicará todas las horas del día y de la noche a las tareas docentes y administrativas de nuestra Facultad de Derecho.

Veamos de nuevo el récord del Colegio de Leyes de la Universidad de Puerto Rico. Durante su primer año de vida tuvo un solo profesor, el licenciado Don José Benedicto y Géigel, quien enseñaba todos los cursos. Era un jurista extraordinario, pero "no tenía grados avanzados en el estudio del Derecho".

Los grados académicos avanzados no hacen necesariamente a un buen abogado o a un buen profesor. El Colegio de Leyes de la Universidad de Puerto Rico fue acreditado en Diciembre de 1945, o sea, 32 años después de fundado. Para esa fecha solamente tenía cuatro profesores de tiempo completo y cuatro profesores de tiempo parcial en adición al Decano.

Al final de sus dos años de vida, la Facultad de Derecho de la Universidad Interamericana cuenta con cuatro profesores de tiempo completo y ocho profesores de tiempo parcial, todos ellos miembros del Foro y líderes distinguidos en su profesión.

*Informe es Prejuiciado*

El Informe del Comité de Acreditación, compuesto en su mayoría, por profesores del propio Colegio de Leyes de la Universidad de Puerto Rico, es totalmente negativo. Ignora los logros positivos y creadores de nuestra facultad, la calidad y experiencia profesional de su profesorado, la preparación y experiencia del estudiantado y el servicio que presta al pueblo de Puerto Rico. Tales errores de omisión y de comisión tuercen la imagen de esta institución educativa profesional, que tanto necesita Puerto Rico.

Tenemos, por ejemplo, la Biblioteca, de primera clase, que es una de las mejores en Puerto Rico. La misma incluye tratados de los más eminentes comentaristas europeos, latinoamericanos y angloamericanos; las Decisiones de las Cortes Supremas de Puerto Rico, Estados Unidos, España y de todos los estados de la Unión; Revistas jurídicas de las más importantes del mundo; y las principales Enciclopedias Jurídicas. Nuestra Bibliotecaria, la licenciada Carmen Pura Jiménez, fue Bibliotecaria Legal del Departamento de Justicia, de la Corte Suprema de Puerto Rico y de la Biblioteca Legal de la Universidad de Kansas City.

Nuestra Biblioteca cuenta con aproximadamente 13,000 volúmenes. Comparemos este récord con el del Colegio de Leyes de la Universidad de Puerto Rico. En el 1941, cuando ya tenía 28 años de fundado, su biblioteca legal tenía solamente 3,600 volúmenes. En junio 30 de 1944, 31 años después de fundado, tenía 4,500 volúmenes. Cuando fue acreditado en Diciembre de 1945, alcanzó la cifra de 11,500 volúmenes.

En esta área la Facultad de Derecho de la Universidad Interamericana ha sobrepasado, en menos de dos años, el récord establecido por el Colegio de Leyes de la Universidad de Puerto Rico, en 32 años.

Es doloroso tener que contestar esta clase de cargos infundados que se han hecho contra nuestra Universidad. Nuestra Facultad de Derecho fue fundada para servir a Puerto Rico

y para suplir una necesidad de su pueblo. Es nuestro propósito hacer profesionales de sobresaliente habilidad e integridad, quienes se dediquen a la práctica del derecho con dedicación, perseverancia y fe en el futuro de nuestro pueblo y de su cultura.

Yo no creo que ningún hombre, con mente justiciera, puede criticar nuestro propósito, ni tampoco criticar el progreso sustancial que hemos logrado hacia ese fin, ni dudar de la sinceridad y honradez de nuestras convicciones.